**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF IOWA**
**EASTERN DIVISION**

EUGENE STEWART,

          Plaintiff,

vs.

MUTUAL WHEEL COMPANY,

          Defendant.

No. 09-CV-1050-LRR

**ORDER**

_____

*TABLE OF CONTENTS*

I.     **INTRODUCTION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **2**

II.    **RELEVANT PROCEDURAL HISTORY** . . . . . . . . . . . . . . . . . . . . . . . **2**

III.   **SUBJECT MATTER JURISDICTION** . . . . . . . . . . . . . . . . . . . . . . . **2**

IV.   **SUMMARY JUDGMENT STANDARD** . . . . . . . . . . . . . . . . . . . . . . . . **3**

V.    **RELEVANT FACTUAL BACKGROUND** . . . . . . . . . . . . . . . . . . . . . . **3**

     *A.*    *Players* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
     *B.*    *2002 Golf Outing* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **4**
     *C.*    *2007 Scrap Metal Conflict* . . . . . . . . . . . . . . . . . . . . . . . . **6**
     *D.*    *Reimbursement Conflict* . . . . . . . . . . . . . . . . . . . . . . . . . **7**
     *E.*    *First Anonymous Letter* . . . . . . . . . . . . . . . . . . . . . . . . . **8**
     *F.*    *Second Anonymous Letter* . . . . . . . . . . . . . . . . . . . . . . . . **9**
     *G.*    *Plaintiff's Meetings with Butler Benefit Services* . . . . . . . . . . . . . . **9**
     *H.*    *Engstrom Brothers' Investigation* . . . . . . . . . . . . . . . . . . . **10**
     *I.*    *Plaintiff's Termination* . . . . . . . . . . . . . . . . . . . . . . . . . **11**
     *J.*    *Mutual Wheel's Prior Theft Experience* . . . . . . . . . . . . . . . . . **12**

VI.   **ANALYSIS** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **12**

     *A.*    *Remaining Evidentiary Issue* . . . . . . . . . . . . . . . . . . . . . . **12**
     *B.*    *ADEA and ICRA* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **13**
     *C.*    *Plaintiff's Prima Facie Case* . . . . . . . . . . . . . . . . . . . . . . **15**
     *D.*    *Mutual Wheel's Legitimate Non-Discriminatory Reason* . . . . . . . . **17**
     *E.*    *Pretext* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **18**
          *1.*    *ADEA claim* . . . . . . . . . . . . . . . . . . . . . . . . . **19**

      *2.     ICRA claim* . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **19**

**VII.  CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . **20**

## I. INTRODUCTION

The matter before the court is Defendant Mutual Wheel Company's ("Mutual Wheel") "Motion for Summary Judgment" ("Motion") (docket no. 18).

## II. RELEVANT PROCEDURAL HISTORY

On October 13, 2009, Plaintiff Eugene Stewart filed a Petition and Jury Demand ("Complaint") (docket no. 4) in the Iowa District Court for Dubuque County, case no. 0311LAC056273. Plaintiff alleges that Mutual Wheel discriminated against him by "terminating his employment because of his age," in violation of the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, *et seq.*, and the Iowa Civil Rights Act of 1965 ("ICRA"), Iowa Code § 216.1, *et seq.* Complaint at ¶¶ 15, 23.

On November 9, 2009, Mutual Wheel removed the action to this court on the basis of both federal question and diversity jurisdiction. On November 30, 2009, Defendant filed an Answer (docket no. 9). On November 30, 2010, Mutual Wheel filed the Motion. On January 10, 2011, Plaintiff filed a Resistance (docket no. 22). On January 19, 2011, Mutual Wheel filed a Reply (docket no. 24). Plaintiff requests oral argument on the Motion. The court finds that oral argument is unnecessary. The Motion is fully submitted and ready for decision.

## III. SUBJECT MATTER JURISDICTION

The court has diversity subject matter jurisdiction over Plaintiff's claims because complete diversity exists among the parties and the amount in controversy exceeds $75,000. *See* 28 U.S.C. § 1332 ("The district courts shall have original jurisdiction of all civil actions where the matter in controversy exceeds the sum or value of $75,000 . . . and is between citizens of different States"). The court also has federal question subject matter jurisdiction over Plaintiff's claim arising under the ADEA. *See* 28 U.S.C. § 1331 ("The

district courts shall have original jurisdiction of all civil actions arising under the Constitution, laws or treaties of the United States.").

## IV. SUMMARY JUDGMENT STANDARD[1]

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is genuine when 'a reasonable jury could return a verdict for the nonmoving party' on the question." *Woods v. DaimlerChrysler Corp.*, 409 F.3d 984, 990 (8th Cir. 2005) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A fact is material when it "might affect the outcome of the suit under the governing law." *Anderson*, 477 U.S. at 248. "[T]o establish the existence of a genuine issue of material fact, 'a [non-moving party] may not merely point to unsupported self-serving allegations.'" *Anda v. Wickes Furniture Co.*, 517 F.3d 526, 531 (8th Cir. 2008) (quoting *Bass v. SBC Commc'ns, Inc.*, 418 F.3d 870, 872 (8th Cir. 2005)). Rather, the nonmoving party "'must substantiate [its] allegations with sufficient probative evidence that would permit a finding in [its] favor.'" *Anda*, 517 F.3d at 531 (quoting *Bass*, 418 F.3d at 873). The court must view the record in the light most favorable to the nonmoving party and afford it all reasonable inferences. *Baer Gallery, Inc. v. Citizen's Scholarship Found. of Am., Inc.*, 450 F.3d 816, 820 (8th Cir. 2006) (citing *Drake ex rel. Cotton v. Koss*, 445 F.3d 1038, 1042 (8th Cir. 2006)).

## V. RELEVANT FACTUAL BACKGROUND

Construed in the light most favorable to Plaintiff, the undisputed facts are as follows.

---

[1] An amended version of Federal Rule of Civil Procedure 56 became effective on December 1, 2010, while the Motion was pending. However, "[t]he standard for granting summary judgment remains unchanged." Fed. R. Civ. P. 56 advisory committee's note.

## A. Players

Mutual Wheel is a Delaware Corporation operating as a family-owned warehouse distributor of truck and trailer parts. Mutual Wheel's corporate headquarters is in Moline, Illinois. Plaintiff is an Iowa citizen and was born in 1938. On March 6, 1966, Plaintiff began working in an entry-level position at Mutual Wheel's Dubuque, Iowa, store. At that time, Donald Engstrom was Mutual Wheel's owner and President. Donald's wife, June Engstrom, and their three sons, David, Richard and Robert Engstrom (collectively, "the Engstrom brothers"), assisted Donald with Mutual Wheel's operations. In 1972, Mutual Wheel promoted Plaintiff to assistant manager of the Dubuque store.

In 1989, Donald retired from his position as Mutual Wheel's President. At the time of Donald's retirement, Donald and June were Mutual Wheel's majority shareholders. Upon Donald's retirement, Mutual Wheel's Board of Directors created the Office of the President, which is comprised of the Engstrom brothers. Every year, Donald and June gifted Mutual Wheel stock to the Engstrom brothers until they eventually owned the company. In 1993, the Engstrom brothers promoted Plaintiff to branch manager of the Dubuque store.

Although Donald, age 91, and June, age 86, are retired, they serve Mutual Wheel's management in an advisory capacity. Donald and June are Directors on Mutual Wheel's Board, and Donald currently serves as the Board Chairman. In May 2010, Mutual Wheel employed approximately 75 individuals, 41 of whom were over the age of 50. Mutual Wheel's oldest employee is 80 years old.[2]

## B. 2002 Golf Outing

On June 5, 2002, Plaintiff, Donald, Richard and a Mutual Wheel employee, Maynard Winkler, attended a golf outing. After Plaintiff and Donald left for the day,

---

[2] The record does not include similar statistics regarding Mutual Wheel's staff at the time of Plaintiff's termination in 2008.

Richard spoke privately with Winkler about Plaintiff's health problems.[3]  Specifically, Richard discussed the fact that Plaintiff was having back problems and was coming to work late.  Richard told Winkler that Plaintiff looked like he was "in pretty good shape." Plaintiff's Appendix ("Pl. App'x") (docket no. 22-2) at 48.  Richard then told Winkler, "We're thinking about making a change in management at the store."  *Id.* at 49.  Richard testified that the purpose of the discussion was "to find out if [Winkler] had a long-term interest in . . . being the manager of the Dubuque store."  *Id.* at 36.  Winkler later told Plaintiff about the discussion.

On June 20, 2002, Donald came to the Dubuque store and spent the day with Plaintiff.  During the visit, neither Plaintiff nor Donald mentioned the June 5, 2002 discussion between Richard and Winkler.  After Donald left, Plaintiff called David to notify him that Donald was on his way to Moline.[4]  Plaintiff brought up the June 5, 2002

---

[3] To the extent that Mutual Wheel objects to Plaintiff's statement of facts regarding the conversation between Richard and Winkler during the golf outing as inadmissible hearsay, the objections are overruled.  Winkler's statements are admissible because they are set forth in his deposition testimony and do not constitute hearsay.  *See* Fed. R. Evid. 801(c) ("'Hearsay' is a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted").  Furthermore, Winkler's testimony regarding what Richard told him is not hearsay.  *See* Fed. R. Evid. 801(d)(2)(C) & (D) (explaining that a statement is not hearsay if it is offered against a party and is either a statement by a person authorized to make such a statement, or is a statement by the party's agent concerning a matter within the scope of the agency).

[4] Mutual Wheel objects to portions of Plaintiff's statement of facts regarding the contents of the telephone conversation as inadmissible hearsay.  Plaintiff alleges that Robert told him that Donald knew that they had offered Plaintiff's job to Winkler and that Donald "told his sons that if they fired [Plaintiff] they would not be welcome in [Donald's] home anymore."  Pl. Statement of Facts at ¶ 83.  Donald's statement constitutes inadmissible hearsay because Mutual Wheel did not authorize Donald to make this statement, and he did not make the statement in the course of his employment.  *See* Fed. R. Evid. 801(d)(2)(C) & (D); *E.E.O.C. v. Con-Way Freight, Inc.*, 622 F.3d 933, 937 (8th Cir. 2010).  Mutual Wheel's objection is sustained, and the court declines to consider the statements that Donald allegedly made to Robert and Robert reportedly told Plaintiff during

discussion between Richard and Winkler, and David told Plaintiff that he could work at Mutual Wheel until he was 80 years old.

Later in the summer of 2002, Robert asked Plaintiff if he knew why they had offered his job to Winkler. When Plaintiff stated that he did not know, Robert informed him that it was because they thought Plaintiff's health was worse than it was.[5] Mutual Wheel and Winkler deny that anyone offered Plaintiff's job to Winkler in 2002.

### C. 2007 Scrap Metal Conflict

Several of Mutual Wheel's stores have drive-in service shops which accumulate worn metal parts. Each store discards this material by selling it as scrap metal. For fifteen years, Plaintiff collected the money from the sale of scrap metal and maintained a scrap fund at the Dubuque store. Plaintiff used this fund to buy employees lunch on their birthdays and dinner during the holidays, to make donations to United Way on Mutual Wheel's behalf and to buy hats and pins for the salesmen to give to customers.

In 2007, the Engstrom brothers decided that the company would require each store to forward the money obtained from the sale of scrap metal to Mutual Wheel's Moline headquarters. On May 1, 2007, Robert held a meeting with all of the branch managers,

---

this telephone conversation.

[5] Mutual Wheel objects to Plaintiff's statement of facts regarding this conversation and asserts that Plaintiff's statements are "based upon a hearsay statement of [Robert] that was not based on personal knowledge[.]" Mutual Wheel's Response to Statement of Additional Undisputed and/or Disputed Material Facts ("MW Response to Pl. Facts") (docket no. 24) at ¶¶ 84-85. Plaintiff's statements regarding this conversation do not constitute hearsay, as they were made by Robert in the course of his position in the Office of the President and are being offered against Mutual Wheel. *See* Fed. R. Evid. 801(d)(2)(D). Furthermore, these statements do not violate Federal Rule of Evidence 602, which states that "[a] witness may not testify to a matter unless evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter." Plaintiff is the witness who testified to these facts, and Plaintiff has personal knowledge of the conversation between himself and Robert. Mutual Wheel's objections pertaining to this conversation are overruled.

including Plaintiff, and directed that all stores must send their scrap proceeds to corporate headquarters. Plaintiff did not want to send the scrap proceeds to corporate headquarters, so Plaintiff decided to wait until David visited the Dubuque store to discuss the matter with him. The next time David visited the Dubuque store, Plaintiff and David discussed the scrap fund. Plaintiff maintains that David agreed to allow Plaintiff to keep the fund in Dubuque. David denies telling Plaintiff that he could keep the fund in Dubuque, and instead states that he gave Plaintiff permission to use the money to purchase stocking caps before sending the money to corporate headquarters. Plaintiff continued to maintain the scrap fund at the Dubuque store until his termination.

### D. Reimbursement Conflict

In October 2007, David raised concerns with Robert and Richard that Plaintiff was charging Mutual Wheel abnormally high mileage for the use of Plaintiff's personal vehicle and trailer. Although Plaintiff used his personal vehicle for work purposes in the past, his claimed mileage rates had increased. On October 30, 2007, David wrote Plaintiff a letter and asked three questions: (1) "Why are you using your personal vehicle[,] [d]on't we have a spare truck in Dubuque?"; (2) "On the September report, you have August entries, are those actually September dates? If so, you have one on September 3, 2007, Labor Day"; and (3) "There is also mileage being charged for a trailer?" Mutual Wheel's Appendix ("MW App'x") (docket nos. 18-3 & 18-4) at 15.

Plaintiff responded to David's letter with a series of letters. In the first letter, Plaintiff listed several reasons why he preferred to use his personal vehicle instead of the company vehicle. Plaintiff indicated that he had driven the route of another employee the previous week, and, on some days, he had driven a thousand miles. Plaintiff stated, "I have been driving my own vehicle for all the years as manager and I guess we should discuss a solution that meets your approval. It will not upset me to resign at the end of this year instead of 2008. May be best for your company." *Id.* at 18. In the second letter,

Plaintiff explained that the August entries were supposed to be September dates, and he explained why he chose to work on Labor Day. Finally, in the third letter, Plaintiff explained that he used his personal trailer "on a few trips" to haul especially heavy items that would not fit in a pick-up truck. *Id.* at 20.

In December 2007, David visited the Dubuque store and discussed the issues with Plaintiff. David directed Plaintiff to stop using his personal vehicle for work and instructed Plaintiff that he needed to be present in the store. On February 8, 2008, Plaintiff sent David his expense reports for December and January and stated, "as per your request I have discontinued the use of my truck and trailer for Mutual Wheel business." *Id.* at 21.

### E. First Anonymous Letter

In January 2008, Robert received an anonymous letter. The letter was postmarked January 14, 2008. The letter began by stating, "THINGS YOU NEED TO KNOW ABOUT DUBUQUE STORE," and then set forth several allegations of misconduct involving Plaintiff and Plaintiff's son, who continues to work for Mutual Wheel. *Id.* at 35. Among other allegations, the letter stated that Plaintiff regularly left work early, was seeking company reimbursement for personal matters and was selling Mutual Wheel's scrap metal and keeping the proceeds for himself. Robert brought the letter to the attention of his brothers, and they discussed the matter. The Engstrom brothers speculated that a disgruntled store employee may have written the letter, and they decided not to act on the letter's allegations. Instead, "they decided to ride the year out until [Plaintiff's] retirement[.]" Mutual Wheel's Statement of Undisputed Facts in Support of Motion for Summary Judgment ("Mutual Wheel's Statement of Facts") (docket no. 18-2) at ¶ 57; Plaintiff's Response to Defendant's Statement of Undisputed Facts in Support of Motion for Summary Judgment and Plaintiff's Statement of Additional Undisputed and/or Disputed Material Facts ("Pl. Statement of Facts") (docket no. 22-3) at ¶ 57.

### *F. Second Anonymous Letter*

In April 2008, Richard received a second anonymous letter. The letter was postmarked April 22, 2008. The letter set forth additional allegations of misconduct involving Plaintiff and an employee named Dusty, who continues to work for Mutual Wheel. Specifically, the letter alleged that (1) managers at the Dubuque store did not work past noon; (2) Plaintiff directed Alter Scrap Processing ("Alter"), a company that purchased scrap metal from Mutual Wheel's Dubuque store, to make checks payable to Plaintiff; (3) the scrap metal checks constituted "extra income" for Plaintiff, MW App'x at 38; (4) Dusty has only one job, and he gets overtime which the rest of the employees are not given; (5) Dusty was delivering parts, until it was discovered that he did not have a valid diver's license, and now Plaintiff gives him "comp time at [Mutual Wheel] to remove shingles from a roof and move furniture at a house that [Plaintiff] is remodeling," *id.* at 39; (6) Dusty was leaving work early and Plaintiff was writing in a later time on Dusty's time-cards; (7) Plaintiff may have used parts from Mutual Wheel on his own vehicle without paying for them; (8) there could be "money laundering going on" because the cash drawer is only counted twice a month, there are blank checks Plaintiff signed in the checkbook and there are "several hundreds of dollars in the cash drawer and safe," *id.* at 40; (9) Plaintiff tells customers he has no intention of retiring because he can come and leave whenever he wants and he gets paid a good wage; and (10) Plaintiff went to the Mayo Clinic and did not report the sick time or vacation time. Richard brought the letter to the attention of his brothers, and they decided to contact Alter to verify the allegations.

### *G. Plaintiff's Meetings with Butler Benefit Services*

On April 29, 2008, Plaintiff met with a representative from Butler Benefit Services, Mutual Wheel's health insurance administrator. During that meeting, the representative told Plaintiff that his insurance premium through Mutual Wheel would be $90 per month, and asked Plaintiff to go on Medicare. Plaintiff and the representative also discussed the

costs of Plaintiff's hospital visits and whether Plaintiff could maintain his vision and dental insurance policies through his wife's employer if he were on Medicare.

The following day, Plaintiff had a wellness meeting with the Butler Benefit Services representative. Robert also attended the wellness meeting. At some point that day, Plaintiff informed Robert that he could not go on Medicare. Robert responded by asking Plaintiff if he knew that a heart bypass surgery could cost $100,000. Robert does not "recall" making this statement. Pl. App'x at 40.

On the same date, Robert asked Winkler to come to Moline to interview for the manager position at the Dubuque store. Mutual Wheel asserts that the discussion with Winkler was about his taking over the Dubuque branch manager position after Plaintiff retired at the end of 2008. Plaintiff maintains that he did not notify the Engstrom brothers that he intended to retire at the end of 2008.

## H. Engstrom Brothers' Investigation

The Engstrom brothers did not conduct any investigation into the allegations of the first anonymous letter. The Engstrom brothers also did not investigate any of the allegations in the second anonymous letter regarding Dusty. The Engstrom brothers did, however, contact Alter to investigate the second anonymous letter's allegations regarding Plaintiff's theft of scrap metal funds.

On May 2, 2008, Alter faxed David copies of three scrap metal checks that Alter issued in February and March of 2008, which were made payable to Plaintiff. The checks were in the amount of $402.50, $173.90 and $244.83, respectively. Alter had previously issued scrap metal checks made payable to Mutual Wheel. Although Plaintiff maintains that he did not instruct Alter to make the checks payable to him, he admits that he did not refuse the checks or object that they were made payable to him instead of Mutual Wheel. Plaintiff states that "[h]e did not complain about the checks being made out to him because it made it easier for him to cash the checks and put the money in the scrap fund." Pl.

Statement of Facts at ¶ 103. Plaintiff explained that, before Alter began making checks out to Plaintiff, a Mutual Wheel employee would put the check in the Dubuque store's cash drawer until Mutual Wheel had sufficient cash to cover the check.

The Engstrom brothers maintain that, based upon the checks they received from Alter, they concluded that Plaintiff was stealing from Mutual Wheel's scrap fund and decided to accelerate Plaintiff's retirement and effectively terminate his employment. The Engstrom brothers also assert that, because they believed Plaintiff intended to retire at the end of 2008, they decided to continue paying Plaintiff his regular salary through the end of the year. The Engstrom brothers admit that they did not discuss the letters or the checks with Plaintiff.

## I. *Plaintiff's Termination*

Mutual Wheel maintains that the Engstrom brothers wanted to hire Plaintiff's replacement before they terminated Plaintiff. Although the record does not reflect when they did so, the Engstrom brothers offered the Dubuque store manager position to Winkler, who turned it down. The Engstrom brothers then offered the position to Paul Largent, who was 61 years old. Largent accepted the offer and continues to serve as the Dubuque store branch manager.

On June 10, 2008, one of the Engstrom brothers called Plaintiff and asked him to meet them at a McDonald's restaurant. When Plaintiff arrived, David informed Plaintiff that they wanted him to retire immediately. Plaintiff replied that he understood what David was saying because "they did the same thing to their father when he turned 70," and Robert responded, "Yes, we did." Pl. Statement of Facts at ¶ 93. The Engstrom brothers each testified that neither Plaintiff nor Robert made these statements. Plaintiff asked the Engstrom brothers what Donald had done "when work was everything and he suddenly had no job." *Id.* at ¶ 94. The Engstrom brothers responded that Donald had gone to his home in Florida for eight months. At no time during the meeting did the Engstrom brothers

inform Plaintiff that they were accelerating his retirement because they believed he had stolen Mutual Wheel's scrap metal funds. Plaintiff was 69 years old at the time of his termination.

On June 25, 2008, Plaintiff drafted a letter to Robert, reiterating that he intended to accept Mutual Wheel's offer to pay him his regular salary through the end of 2008. Shortly thereafter, Mutual Wheel paid Plaintiff a lump sum of $33,450, which represented his regular salary as though he had worked from June 15, 2008 through December 31, 2008.

### J. Mutual Wheel's Prior Theft Experience

In 2006, Mutual Wheel had an unrelated experience with theft by a store manager. When the Engstrom brothers learned of the theft, Mutual Wheel terminated the store manager. The store manager was 46 years old at the time of his termination.

## VI. ANALYSIS

### A. Remaining Evidentiary Issue

Plaintiff alleges that during a telephone conversation in 2005 or 2006, Donald told Plaintiff that his sons forced him to retire at the age of 70. Donald denies making this statement, and the Engstrom brothers deny that they forced their father to retire. Mutual Wheel objects to the court's consideration of Plaintiff's description of the alleged telephone conversation as inadmissible hearsay. The court concludes that Plaintiff's testimony regarding what Donald told him during a telephone conversation in 2005 or 2006 is hearsay because Mutual Wheel did not authorize Donald to make this statement, and Donald did not make the statement in the course of his employment. *See* Fed. R. Evid. 801(d)(2)(C) & (D); *Con-Way Freight*, 622 F.3d at 937; *Ahlberg v. Chrysler Corp.*, 481 F.3d 630, 636 (8th Cir. 2007). Further, the statement is not admissible pursuant to a hearsay exception. *See* Fed. R. Evid. 802-803. Consequently, the court shall not consider this fact in its analysis.

## B. ADEA and ICRA

Under the ADEA and ICRA, employers are forbidden from taking adverse employment actions against employees because of their age. *See* 29 U.S.C. § 623(a)(1); Iowa Code § 216.6(1)(a); *Newberry v. Burlington Basket Co.*, 622 F.3d 979, 982 (8th Cir. 2010) ("The ICRA, like the ADEA, provides for liability when a defendant discharges an employee 'because of' age."). A plaintiff may establish a claim of intentional age discrimination either through direct or circumstantial evidence of such discrimination. *Fitzgerald v. Action, Inc.*, 521 F.3d 867, 876 (8th Cir. 2008) (citing *Carraher v. Target Corp.*, 503 F.3d 714, 716 (8th Cir. 2007)); *see also Loeb v. Best Buy Co., Inc.*, 537 F.3d 867, 872 (8th Cir. 2008). "Where, as here, the plaintiff presents only circumstantial evidence of discrimination, we apply the familiar burden-shifting analysis of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)." *Loeb*, 537 F.3d at 872.

Under the *McDonnell Douglas* burden-shifting framework, a plaintiff must first establish a prima facie case of discrimination. *Ramlet v. E.F. Johnson Co.*, 507 F.3d 1149, 1153 (8th Cir. 2007) (citing *McDonnell Douglas*, 411 U.S. at 802). In order to establish a prima facie case of age discrimination, Plaintiff must show: (1) at the time of his termination, he was over 40 years of age; (2) he was otherwise qualified for the position he held; (3) he was discharged from employment; and (4) he was replaced by a younger employee. *See Loeb*, 537 F.3d at 872 (citing *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 142 (2000)); *see also Anderson v. Durham D & M, L.L.C.*, 606 F.3d 513, 523 (8th Cir. 2010) ("[Plaintiff] may establish a prima facie case of age discrimination with a showing that (1) he is over forty; (2) he was qualified for the position; (3) he suffered an adverse employment action; and (4) similarly-situated employees outside the class were treated more favorably."). If Plaintiff establishes a prima facie case of discrimination, then the burden shifts to Mutual Wheel to articulate a legitimate, non-discriminatory reason for the employment decision. *Ramlet*, 507 F.3d at

1153. If Mutual Wheel provides such a reason, then the burden shifts back to Plaintiff to present evidence that the proffered reason was pretext for age discrimination. *Id.* (citing *Haas v. Kelly Servs., Inc.*, 409 F.3d 1030, 1035 (8th Cir. 2005)).

In *Gross v. FBL Fin. Servs., Inc.*, ___ U.S. ___, 129 S. Ct. 2343 (2009), the United States Supreme Court set forth a new standard for establishing disparate treatment claims under the ADEA. Under the new standard, "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Id.* at 2352. "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.*

Generally, when considering age discrimination claims brought under the ICRA, Iowa courts "turn to federal law interpreting the [ADEA]." *Weddum v. Davenport Cmty. Sch. Dist.*, 750 N.W.2d 114, 118 (Iowa 2008); *see also Vivian v. Madison*, 601 N.W.2d 872, 873 (Iowa 1999) (providing that Iowa courts traditionally turn to federal law for guidance in evaluating the ICRA). "Federal law, however, is not controlling." *Vivian*, 601 N.W.2d at 873. For example, a plaintiff's burden to establish causation under the ADEA is different from a plaintiff's burden to establish causation under the ICRA. In *DeBoom v. Raining Rose, Inc.*, 772 N.W.2d 1, 13-14 (Iowa 2009), a case decided after *Gross*, the Iowa Supreme Court determined that under the ICRA, a "plaintiff need only demonstrate 'termination occurred under circumstances giving rise to an inference of discrimination' and his or her status as a member of a protected class was *a* determining factor in the decision to terminate employment." *Id.* at 13 (quoting *Smidt v. Porter*, 695 N.W.2d at 9, 14-16 (Iowa 2005)). In *Schott v. Care Initiatives*, 662 F. Supp. 2d 1115, 1120 (N.D. Iowa 2009), this court set forth the following interpretation of *DeBoom*:

> Notwithstanding that the Iowa Supreme Court did not
> mention *Gross* in its analysis, this court believes that it could

not be clearer that the Iowa Supreme Court does *not* impose a "but for" causation standard in any ICRA employment discrimination case, based on age or any other protected characteristic, and that the appropriate causation standard in such cases is "motivating factor." In short, the causation standards for [a plaintiff's] age discrimination claims under federal and state law are *different*, as a matter of law, even if the same analytical framework is otherwise applicable to the two claims.

*Id.*

## C. Plaintiff's Prima Facie Case

For purposes of the Motion, "Mutual Wheel does not dispute the first three elements of [Plaintiff's] prima facie case." Mutual Wheel's Brief in Support of Motion for Summary Judgment ("MW Br.") (docket no. 18-1) at 13. Thus, the court will proceed as though Plaintiff has established that, at the time he was discharged from his employment, he was over the age of 40 and qualified for the position he held. *See Loeb*, 537 F.3d at 872. In order to satisfy the last element of the prima facie case and establish an inference of age discrimination, Plaintiff must demonstrate "that [he] was 'replaced by a person *sufficiently younger* to permit an inference of discrimination.'" *Keathley v. Ameritech Corp.*, 187 F.3d 915, 920 (8th Cir. 1999) (quoting *Rinehart v. City of Independence*, 35 F.3d 1263, 1269 (8th Cir. 1994)). The Eighth Circuit Court of Appeals has "frequently stated that the last prong of the prima facie case is established by demonstrating the plaintiff was replaced by a substantially younger individual." *Durham*, 606 F.3d at 523. An inference of age discrimination "cannot be drawn from the replacement of one worker with another worker insignificantly younger." *O'Connor v. Consolidated Coin Caterers Corp.*, 517 U.S. 308, 313 (1996).

Plaintiff was 69 years old at the time of his termination. Before Mutual Wheel discharged Plaintiff, Mutual Wheel secured Plaintiff's replacement, who was 61 years old. Thus, there was an eight year age difference between Plaintiff and his replacement. In

*Girten v. McRentals, Inc.*, 337 F.3d 979, 982 (8th Cir. 2003), the Eighth Circuit Court of Appeals considered an age discrimination claim where the plaintiff was replaced by an employee who was nine years younger. The Eighth Circuit Court of Appeals noted that "[t]he nine-year age difference between [one of the plaintiffs] and his replacement may not be sufficient to infer age discrimination." *Id.* The *Girten* opinion then continued with an analysis under *McDonell Douglas*, and affirmed the district court's grant of summary judgment in favor of the employer because, among other things, the plaintiffs failed to make "a strong prima facie case[.]" *Id.* at 983.

Similarly, the eight year age difference between Plaintiff and the employee who replaced him may not be significant enough to infer age discrimination. However, "the 'elements of a prima facie case are flexible and vary depending on the factual situation giving rise to the dispute.'" *Keathley*, 187 F.3d at 920 (quoting *Wilson v. Int'l Bus. Machs. Corp.*, 62 F.3d 237, 241 (8th Cir. 1995)). To determine whether Plaintiff can demonstrate a prima facie case, the court must also consider whether Plaintiff demonstrated that the adverse employment action occurred under circumstances which give rise to an inference of unlawful discrimination. *See id.* at 921; *Wilson*, 62 F.3d at 241.

Plaintiff alleges that the following facts are sufficient to infer age discrimination: (1) in 2002, Richard had a conversation with a Mutual Wheel employee about Plaintiff's health and stated that he was thinking of "making a change in management at the [Dubuque] store," Pl. App'x at 49; (2) when Plaintiff raised the conversation with David, David declared that Plaintiff could work at the store until he was 80 years old; (3) Robert later told Plaintiff that Mutual Wheel discussed replacing Plaintiff because the Engstrom brothers thought his health was worse than it was; (4) on April 29, 2008, Plaintiff met with a representative of Mutual Wheel's insurance administrator, who suggested Plaintiff go on Medicare; (5) on April 30, 2008, or the date when Plaintiff told Robert that he could not go on Medicare, Robert responded by asking Plaintiff whether he knew that a heart bypass

could cost $100,000; (6) on the same date, Robert asked another Mutual Wheel employee to interview for Plaintiff's management position; (7) on June 10, 2008, the Engstrom brothers terminated Plaintiff; and (8) when Plaintiff stated that they did the same thing to their father when he turned 70, Robert responded, "Yes, we did." Pl. Statement of Facts at ¶ 93. Also relevant are the facts that the Engstrom brothers did not ask Plaintiff, a Mutual Wheel employee since 1966, if he had taken the scrap metal funds for personal use; they did not investigate any of the other allegations in the letters, including allegations against another, presumably younger, Mutual Wheel employee; they did not notify Plaintiff of the reasons for his termination; and they paid Plaintiff $33,450.

Viewing the facts in the light most favorable to Plaintiff and granting him all reasonable inferences, the court finds that Plaintiff has presented a prima facie case of age discrimination. *See Keathley*, 187 F.3d at 921. The court recognizes that "factors other than age . . . which may be correlative with age, do not implicate the prohibited stereotype, and are thus not prohibited considerations." *Schlitz v. Burlington N. R.R.*, 115 F.3d 1407, 1412 (8th Cir. 1997); *see also Hazen Paper Co. v. Biggins*, 507 U.S. 604, 609 (1993) (holding that it is not unlawful to terminate an older employee to prevent vesting of pension benefits because "there is no disparate treatment under the ADEA when the factor motivating the employer is some feature other than the employee's age"). However, viewing all of the facts together, the court concludes that Plaintiff has presented sufficient evidence that his termination "'occurred under circumstances which give rise to an inference of unlawful discrimination.'" *Keathley*, 187 F.3d at 921 (internal marks omitted) (quoting *Wilson*, 62 F.3d at 241).

### D. Mutual Wheel's Legitimate Non-Discriminatory Reason

Because Plaintiff established a prima facie case of age discrimination, the burden shifts to Mutual Wheel to articulate a legitimate, non-discriminatory reason for Plaintiff's termination. *See Ramlet*, 507 F.3d at 1153. Mutual Wheel sets forth a series of

complaints that it had with Plaintiff during the course of his employment. The complaints include Plaintiff's failure to forward the scrap metal proceeds to the corporate office, Plaintiff's excessive use of his personal vehicle and corresponding reimbursement requests and two anonymous letters which alleged that Plaintiff was involved in various improper business practices.

Richard received the second anonymous letter in April 2008. The letter alleged that Plaintiff directed Alter to make checks for scrap metal payable to him and that he was using the proceeds for personal use. The Engstrom brothers contacted Alter, and Alter faxed the Engstrom brothers copies of three scrap metal checks that Alter made payable to Plaintiff. The Engstrom brothers claim that, when they received copies of the checks, they believed that they had received confirmation that some of the allegations in the second anonymous letter were true. Mutual Wheel maintains that, "[b]ased on the checks provided by Alter, the Engstrom brothers concluded that [Plaintiff] was stealing Mutual Wheel's scrap fund money," and, as a result, "the Engstrom brothers felt that they could no longer trust [Plaintiff] as a branch manager." Mutual Wheel's Statement of Facts at ¶¶ 65, 67. Thus, Mutual Wheel states that, "after receiving the Alter checks, the Engstrom brothers decided to accelerate Stewart's retirement and effectively terminate his employment." *Id.* at ¶ 66. The court concludes that Mutual Wheel articulated a legitimate, non-discriminatory reason for its decision to terminate Plaintiff; namely, the Engstrom brothers' belief that Plaintiff was stealing company property.

### E. Pretext

Because Mutual Wheel articulated a legitimate, non-discriminatory reason, the burden shifts back to Plaintiff to present evidence that Mutual Wheel's proffered reason for his termination was merely pretext for age discrimination. *See Ramlet*, 507 F.3d at 1153.

### 1. ADEA claim

Prior to *Gross*, at this stage in the analysis, a plaintiff could avoid summary judgment by creating a fact issue regarding whether the defendant's proffered reasons were pretextual and creating a reasonable inference that age was a determinative factor in the adverse employment action. *See, e.g., Loeb*, 537 F.3d at 872. However, under *Gross*, "a plaintiff bringing a disparate-treatment claim pursuant to the ADEA must prove, by a preponderance of the evidence, that age was the 'but-for' cause of the challenged adverse employment action." *Gross*, 129 S. Ct. at 2352. "The burden of persuasion does not shift to the employer to show that it would have taken the action regardless of age, even when a plaintiff has produced some evidence that age was one motivating factor in that decision." *Id.*

Based upon the totality of the circumstances, the court concludes that Plaintiff failed to produce sufficient evidence to demonstrate that age was the "but-for" cause of his termination. Mutual Wheel provided substantial evidence regarding the legitimate, non-discriminatory reasons for Plaintiff's termination, and Plaintiff has not met his burden to show that those reasons were not also motivating factors in Mutual Wheel's adverse employment action. Consequently, the court shall grant the Motion to the extent it seeks summary judgment on Plaintiff's ADEA claim.

### 2. ICRA claim

In contrast to the ADEA causation standard, in a claim under ICRA, a "'plaintiff need only demonstrate termination occurred under circumstances giving rise to an inference of discrimination and his or her status as a member of a protected class was *a* determining factor in the decision to terminate employment.'" *Schott*, 662 F. Supp. 2d at 1119 (internal marks omitted) (quoting *DeBoom*, 772 N.W. 2d at 13). Plaintiff sets forth several facts that he believes demonstrate Mutual Wheel's stated reasons for his termination were pretextual. First, Plaintiff references his meetings with Butler Benefit

Services and argues that, "in the days before the decision was made to terminate [Plaintiff's] employment, it is clear [that his] age was being considered in the decision making process." Resistance at 8. Plaintiff then argues that Mutual Wheel did not do a sufficient investigation to determine whether the allegations in the second anonymous letter were true. Plaintiff insists that the Engstrom brothers did not discuss the issue with him or any other employee because Mutual Wheel was looking for a reason to terminate Plaintiff and did not want someone to confirm that Plaintiff had not engaged in theft. Plaintiff further maintains that, at the time of his termination, Plaintiff stated that the Engstrom brothers "did the same thing to their father when he turned 70," and Robert responded, "Yes, we did." Pl. Statement of Facts at ¶ 93. Finally, although not raised by Plaintiff, the record establishes that Mutual Wheel never investigated allegations against another employee, never informed Plaintiff of the reasons for his termination and, despite Plaintiff's alleged theft, paid Plaintiff $33,450 upon his termination.

Construing all of the facts in the light most favorable to Plaintiff, the court concludes that, for purposes of the Motion, Plaintiff has met his burden to demonstrate Mutual Wheel's stated reasons for his termination were pretext for age discrimination. Plaintiff has shown that his termination occurred under circumstances giving rise to an inference of age discrimination, and Plaintiff has raised genuine issues of material fact regarding whether his age was a motivating factor in Mutual Wheel's adverse employment action. Consequently, the court shall deny the Motion to the extent it seeks summary judgment on Plaintiff's ICRA claim.

## VII. CONCLUSION

For the foregoing reasons, the Motion (docket no. 18) is **GRANTED IN PART** and **DENIED IN PART**. The court shall grant the Motion to the extent it seeks summary judgment on Plaintiff's ADEA claim and the court shall deny the Motion to the extent it seeks summary judgment on Plaintiff's ICRA claim.

**IT IS SO ORDERED.**

**DATED** this 16th day of March, 2011.

LINDA R. READE
CHIEF JUDGE, U.S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA